# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. JAMES A. JACKSON

### Direct Appeal from the Circuit Court for Williamson County
### No. I-498-139-A    Donald P. Harris, Judge

---

### 01C01-9812-CR-00507
### No. M1998-00035-CCA-R3-CD - Decided May 5, 2000

---

James A. Jackson appeals his conviction by a jury in the Williamson County Circuit Court of one count of possession of three hundred (300) grams or more of cocaine with intent to sell or deliver, a class A felony, one count of possession of one-half (½) ounce or more of marijuana with intent to sell or deliver, a class E felony, and one count of possession of drug paraphernalia, a class A misdemeanor. Pursuant to the appellant's convictions, the trial court imposed an effective sentence of twenty years incarceration in the Tennessee Department of Correction. On appeal, the appellant presents the following issues for review: (1) whether the trial court erred in overruling the appellant's pre-trial motion to suppress; (2) whether the trial court erred in denying the appellant's motion for a judgment of acquittal at the close of the State's case and, again, at the conclusion of the trial; and (3) whether the evidence adduced at trial supports the jury's verdicts. Following a review of the record and the parties' briefs, we reverse the judgments of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Reversed and Dismissed**.

OGLE, J., delivered the opinion of the court, in which WADE, P.J., and PEAY, J., joined.

Jerry C. Colley, Columbia, Tennessee, for the appellant, James A. Jackson.

Paul G. Summers, Attorney General and Reporter, Mark E. Davidson, Assistant Attorney General, Derek Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

The appellant's convictions arose from a traffic stop on December 18, 1997, of a GMC Suburban sport-utility vehicle driven by the appellant and from the ensuing discovery by police of electronic scales and a substantial amount of cocaine and marijuana inside a suitcase located in the luggage compartment of the vehicle. On April 13, 1998, a Williamson County Grand Jury indicted the appellant along with the two passengers in the Suburban, Christina L. Howard and Jamarcus L. King, on one count of possession of three hundred grams or more of cocaine with intent to sell or deliver, one count of possession of one-half (½) ounce or more of marijuana with intent to sell or deliver, and one count of possession of drug paraphernalia. The three co-defendants were

released on bail, whereupon Ms. Howard fled in order to avoid prosecution.[1]  Accordingly, the State's case proceeded only against the appellant and Mr. King, who filed a motion to suppress the State's use of any evidence seized by the police during the traffic stop of the Suburban.  The trial court conducted a suppression hearing on September 8, 1998, and denied the motion to suppress on September 28, 1998.  The appellant and Mr. King were tried jointly on September 30 and October 1, 1998.  The jury found both the appellant and Mr. King guilty of the charged offenses.  The trial court, however, vacated the jury's verdicts as to Mr. King and entered judgments of conviction as to the appellant.

The evidence adduced at the suppression hearing and at trial established that, on December 18, 1997, at approximately 10:30 p.m., Michael Sprawling, a trooper with the Tennessee Highway Patrol, was parked in his patrol car to one side of the southbound lanes of Interstate 65 near Franklin, Tennessee and was monitoring traffic by radar.  He observed the appellant driving a gray, 1985 GMC Suburban sport-utility vehicle [2] at a speed of eighty-five (85) miles per hour in a sixty-five (65) mile per hour speed zone and, accordingly, activated his blue lights and siren and pursued the appellant.  The appellant promptly responded to the trooper's signal and stopped his vehicle on the shoulder of the road.  Trooper Sprawling parked his patrol car behind the Suburban and approached the vehicle on foot.  At this point, the trooper noticed that the appellant was accompanied by two passengers, a female seated in the front passenger seat and a male seated in the rear passenger seat.  Trooper Sprawling asked the appellant to produce his driver's license and registration and, upon receiving these items, instructed the appellant to get out of his vehicle.  The appellant complied with Trooper Sprawling's order and, in response to questioning by the trooper, also explained that he lived in Fort Wayne, Indiana, and was traveling to Marion, Alabama, near Birmingham, to visit his grandfather.  He confided that his grandfather was ill.  He then identified his female passenger as his girlfriend, Christina Howard, and his male passenger as his cousin, Jamarcus King.

Following this brief conversation, Trooper Sprawling instructed the appellant to sit in the rear passenger seat of his patrol car while he wrote the appellant a citation for speeding.  Once the appellant was seated in the patrol car, however, the trooper again approached the Suburban and spoke with each of the appellant's passengers individually, confirming the passengers' identities and their destination.  Trooper Sprawling noted that, while Mr. King accurately identified the group's destination, he did not mention his ailing grandfather.[3]

---

[1]The record reflects that, at the time of the appellant's sentencing hearing, Ms. Howard had been apprehended by police.

[2]The appellant testified at the suppression hearing that the Suburban belongs to his father.

[3]While the record reflects that the trooper asked Mr. King about the group's destination, the record does not reflect that he inquired concerning the purpose of the trip or otherwise inquired concerning Mr. King's grandfather.

Trooper Sprawling then returned to his patrol car and completed the citation for speeding. Thereafter, both Trooper Sprawling and the appellant got out of the patrol car, and the appellant signed the citation and accepted a copy. The trooper returned to the appellant his driver's license and registration and informed the appellant that he was free to leave. However, as the appellant began to get back into his vehicle, Trooper Sprawling inquired whether he could ask the appellant a question and further inquired whether the appellant was carrying any drugs, weapons, or significant amounts of cash inside his vehicle.

The immediately ensuing events are the subject of dispute. At the suppression hearing and at the appellant's trial, Trooper Sprawling testified that the appellant initially denied possessing any of the items listed by the trooper. The trooper recalled that he next inquired whether he could search the Suburban. According to Trooper Sprawling, the appellant consented to the search and only then admitted that he was carrying a gun inside the Suburban. In contrast, the appellant recounted at the suppression hearing and at trial that, when the trooper inquired concerning the presence of any drugs, weapons, or significant amounts of cash in his vehicle, he promptly confessed to the presence of the gun.[4] According to the appellant, the trooper did not request permission to search the Suburban. Rather, upon the appellant's surrender of his gun, Trooper Sprawling informed the appellant that he intended to search the Suburban.

In any event, it is undisputed that the appellant retrieved his gun from underneath the driver's seat of the Suburban at the officer's request and simultaneously produced a valid Indiana gun permit issued by the Fort Wayne Police Department. The gun itself contained one loaded ammunition clip. The appellant also had an extra, albeit empty, clip for the gun and a box of ammunition.

It is also undisputed that, at this point, Trooper Sprawling again instructed the appellant to sit in the rear passenger seat of his patrol car and then called for back-up assistance from the Franklin Police Department. While awaiting the arrival of assistance, Trooper Sprawling removed three suitcases from the luggage compartment of the Suburban. Officer Charles Kirby of the Franklin Police Department arrived at the scene of the traffic stop several minutes later and, at Trooper Sprawling's direction, searched the suitcases. A search of two of the suitcases revealed only men's clothing. The third suitcase contained women's clothing but also contained two hundred and twenty-two (222) grams of marijuana, two hundred and ninety-three point seven (293.7) grams of crack cocaine, and twenty-five point three (25.3) grams of powder cocaine. The drugs were sealed in plastic bags, which were, in turn, wrapped in a pair of jeans. The parties stipulated at trial that the street value of the cocaine was between thirty and forty-four thousand dollars ($30,000.00 - $44,000.00) and the street value of the marijuana was between eight hundred and nine hundred dollars ($800.00 - $900.00). Officer Kirby also found a pair of electronic scales in the same bag. The appellant denied ownership of the suitcase or knowledge of its contents. Ms. Howard effectively

---

[4]The appellant explained that he did not mention the substantial amount of cash subsequently found in his pocket, because he was distracted by the trooper's reaction to his confession concerning the presence of a gun inside the Suburban.

conceded that the suitcase belonged to her but stated that she had not packed her bag and was not aware of its contents.

Following his discovery of the drugs, Officer Kirby assisted Trooper Sprawling in further searching the Suburban. They did not locate any additional drugs or other evidence. Trooper Sprawling did testify at the suppression hearing and at trial that, as he was searching the appellant's vehicle, he smelled a "chemical odor" toward the rear of the vehicle. The trooper asserted that the odor did *not* resemble the odor of marijuana nor could he otherwise identify the odor. In contrast, Officer Kirby testified that, during the search of the vehicle, he detected the odor of "raw green marijuana" on the passenger side of the vehicle. Neither officer detected any odor indicating that marijuana had been used, i.e., smoked, inside the Suburban.

While Trooper Sprawling and Officer Kirby searched the Suburban and the suitcases found therein, Officer Andrew Green of the Franklin Police Department searched the occupants of the vehicle for weapons. A search of Ms. Howard revealed a small amount of marijuana, adequate for personal use, in a plastic bag. A search of the appellant revealed three separate "bundles" of money in one of the appellant's pockets. One bundle contained one thousand dollars ($1,000.00), the second bundle contained five hundred dollars ($500.00), and the third bundle contained one hundred and forty-five dollars ($145.00). Each bundle of money was folded in half and included various currency denominations. According to Officer Green, the appellant initially indicated that the money belonged to his grandmother. He then clarified that the money in fact belonged to his mother, but he was taking the money to his grandmother in Alabama. Finally he stated that the money was intended for the payment of his grandfather's bills. The appellant indicated that his grandfather was dying.

Officer Green noted that, on one occasion, the appellant referred to the bundle containing one thousand dollars ($1,000) as a "fold" and then appeared to look toward Officer Green as if he were searching for a reaction. Officer Green testified that, during the course of his training, he had learned that "dealer fold" or "fold" is a term commonly used in the drug community. Moreover, Officer Green testified that he had personally heard drug dealers using the term on one or two occasions. The officer explained that a "dealer fold" generally contains one thousand dollars ($1,000) but can also contain smaller amounts.

As noted previously, the appellant testified on his own behalf at his trial. The appellant informed the jury that he was twenty-three years old and lived with his parents. At the time of the instant offenses, he was employed performing "odd jobs," generally amounting to twenty or twenty-five hours of work each week. By the time of his trial, he was employed by his father in his father's lawn care service. The appellant asserted that he did not have a criminal record.

With respect to the instant offenses, the appellant confirmed that, on December 18, 1997, he was driving to Marion, Alabama, near Birmingham, to visit his grandparents. He explained that, at that time, his grandfather was very ill, and his mother had given him money to take to his grandfather. The appellant denied ever stating that he intended to give the money to his

-4-

grandmother. He explained that his grandmother resides in a nursing home in Marion, Alabama, and is incapable of handling money. In any event, the appellant was carrying one thousand, six hundred, and forty-five dollars ($1,645.00) in his pocket. He intended to give one thousand dollars to his grandfather and spend the remaining amount on travel expenses and Christmas presents. According to the appellant, he planned to return home to Indiana before Christmas.

Additionally, the appellant recounted that, on the occasion in question, he had agreed to take his cousin, Jamarcus King, to Alabama to visit their grandparents. The appellant had also agreed to drive a friend, Christina Howard, to St. Louis, Missouri, following his visit to his grandparents in Alabama and on the way home to Indiana. The appellant testified that he had known Ms. Howard for approximately one year. He conceded that he and Ms. Howard had once been intimate but asserted that, at the time of the traffic stop, they were merely friends. The appellant explained that, during the year preceding the traffic stop, he had encountered Ms. King approximately once or twice each month. He denied any knowledge of the contents of her suitcase and also denied that she had used any illegal drugs while inside his vehicle. Finally, the appellant conceded that, when Ms. Howard was released on bail following the instant offenses and sometime after his own release, he and Ms. Howard's cousin drove to Tennessee in order to pick Ms. Howard up and return her to Indiana. He denied any knowledge of Ms. Howard's location at the time of trial.

The appellant's mother, Dorothy Jackson, testified on behalf of the appellant at trial. She testified that she is fifty-four years old and lives in Fort Wayne, Indiana. At the time of the trial, she had worked as a cook for the Fort Wayne State Hospital for thirty-three years. Her husband had worked at the Fort Wayne Foundry for thirty-two years and also operated a lawn care service in his spare time. Ms. Jackson confirmed that her mother and father lived in Marion, Alabama. She also confirmed that, at the time of these offenses, her father was ill, and the family believed that he was suffering from cancer. She confirmed that, on the occasion in question, she had given a substantial amount of cash to the appellant and had instructed her son to take the money to his grandfather. She explained that members of her family take turns assisting her father in paying bills. In 1997, it was her turn to assist her father in paying taxes and in replacing storm doors and windows on his house. She gave a total amount of one thousand, six hundred, and forty-one dollars ($1,641.00) in cash to her son. According to Ms. Jackson, the money was folded together, because she customarily folds her money together "in a certain way." Ms. Jackson asserted that, to her knowledge, her son had never been involved with illegal drugs.

Finally, Jamarcus King also testified on his own behalf at trial. He stated that he was eighteen years old and lived with his mother in Fort Wayne, Indiana. He related to the jury that he has been employed full-time since leaving high school following the tenth grade. At the time of the traffic stop, he was employed at a Kentucky Fried Chicken Restaurant. By the time of his trial, he was employed at a company called Summit Manufacturing.

With respect to the instant offenses, Mr. King confirmed that he agreed to drive to Alabama with the appellant on December 18, 1997, in order to visit their grandparents, because his grandfather was ill. Mr. King asserted that he had never met Christina Howard prior to the road trip

to Alabama and did not know that she was carrying drugs in her suitcase. Like the appellant, he stated that he never observed Ms. Howard smoking marijuana during the road trip.

## II. Analysis

**A.      Did the Trial Court Err in Overruling the Appellant's Pre-Trial Motion to Suppress?**

The appellant initially challenges the trial court's denial of his motion to suppress the State's use at trial of the drugs and the electronic scales found in Ms. Howard's suitcase. Citing State v. Morelock, 851 S.W.2d 838 (Tenn. Crim. App. 1992), the appellant argues that Trooper Sprawling's questioning of the appellant once the purpose of the traffic stop had been fulfilled constituted an unlawful seizure under the Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution. Thus, even assuming the appellant's subsequent consent to the search of the Suburban, the discovery by police of drugs and electronic scales in Ms. Howard's suitcase was the fruit of the unlawful detention and subject to the exclusionary rule. Moreover, the appellant notes that, absent his consent to the search of the Suburban, the search was not otherwise justifiable as "a search incident to a citation." Knowles v. Iowa, __ U.S. __, __, 119 S.Ct. 484, 488 (1998).

Citing State v. Roberge, 642 S.W.2d 716 (Tenn. 1982), the State responds that the appellant does not have standing to challenge the search by police of Ms. Howard's suitcase and the consequent seizure of its contents. Moreover, the State asserts that, even assuming that the appellant possesses standing to challenge the search of Ms. Howard's suitcase, the appellant consented to the search. Contrary to the appellant's argument, the State maintains that the appellant's detention in this case concluded for purposes of the Fourth Amendment to the United States Constitution and Article 1, Section 7 of the Tennessee Constitution when the trooper issued the traffic citation, returned to the appellant his driver's license and registration, and informed the appellant that he was free to leave. According to the State, the subsequent conversation between the trooper and the appellant was a consensual encounter, and the appellant's further consent to the search of the Suburban, including Ms. Howard's suitcase, comported with constitutional standards. The State does not contest the appellant's assertion that, absent the appellant's consent, Trooper Sprawling could not have searched the Suburban consistent with the United States and Tennessee constitutions.

The trial court, at the conclusion of the September 28, 1998 hearing, intimated his agreement with the appellant's proposition that Trooper Sprawling's questioning of the appellant following the issuance of the traffic citation and the return of the appellant's documents constituted an unlawful seizure. Nevertheless, the trial court overruled the appellant's motion to suppress due to his lack of standing to challenge the search of Ms. Howard's suitcase and the seizure of its contents.

### i.      Standard of Review

When reviewing a trial court's ruling on a motion to suppress evidence obtained by police pursuant to a warrantless search or seizure, this court is obliged to uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996); State v. Ashworth, 3 S.W.3d 25, 29

(Tenn.Crim.App. 1999). That having been said, an appellate court's review of the trial court's ruling is not limited to the record of the suppression hearing but extends to the entire record of proceedings. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, this court reviews de novo the trial court's application of the law to the facts. Keith, 978 S.W.2d at 864.

### ii.     Standing

Again, the State argues, and the trial court ruled, that the appellant's lack of any "legitimate expectation of privacy" in Ms. Howard's suitcase, i.e., his lack of standing to challenge the search of Ms. Howard's suitcase, preempts the appellant's suppression argument. Standing is ultimately a question of law, subject on appeal to de novo review against the backdrop of a trial court's factual determinations. United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998). See also United States v. Gama-Bastidas, 142 F.3d 1233, 1237 (10th Cir. 1998); United States v. Ibarra, 948 F.2d 903, 905 (5th Cir. 1991); United States v. Blanco, 844 F.2d 344, 349 n. 4 (6th Cir. 1988); United States v. Kuespert, 773 F.2d 1066, 1067 (9th Cir. 1985); United States v. Smith, 621 F.2d 483, 489 n. 3 (2nd Cir. 1980). Upon a de novo review, we conclude that the State's argument and the trial court's ruling are flawed.

> Professor LaFave noted in his treatise on the law of search and seizure that, in determining in any particular case whether a defendant has standing to seek exclusion of certain evidence on Fourth Amendment grounds, it is critical that the precise police conduct being objected to be properly identified, for this may itself turn out to be determinative on the standing issue.

Wayne R. LaFave, 5 Search and Seizure, § 11.3, at 119-120 (3d ed. 1996). As previously noted, the precise police conduct objected to by the appellant is apparently (1) Trooper Sprawling's questioning of the appellant after the purpose for the traffic stop had been fulfilled and (2) the search by police of the Suburban. In other words, the relevant question is not whether the appellant possesses standing to challenge the search of Ms. Howard's suitcase but, instead, whether he possesses standing to challenge his alleged seizure by Trooper Sprawling and whether he possesses standing to challenge the search of the Suburban. If the appellant possesses standing to challenge the alleged seizure and if he was in fact unlawfully seized (issues that are not entirely distinct), the drugs and electronic scales could be subject to exclusion under the "fruit of the poisonous tree" doctrine regardless of the appellant's standing to challenge the search of Ms. Howard's suitcase. See United States v. Kimball, 25 F.3d 1, 5-6 (1st Cir. 1994); United States v. Erwin, 875 F.2d 268, 269 n.2, 272 (10th Cir. 1989). Compare United States v. Carter, 14 F.3d 1150, 1154-1155 (6th Cir. 1994). See generally Segura v. United States, 468 U.S. 796, 804-805, 104 S.Ct. 3380, 3385 (1984); Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 415 (1963); State v. Patton, 898 S.W.2d 732, 734 (Tenn. Crim. App. 1994); State v. Taylor, No. 02C01-9501-CR-00029, 1996 WL 580997, at *13 (Tenn. Crim. App. at Jackson, October 10, 1996). Similarly, if the appellant possesses standing to challenge the search of the Suburban and if the search was in fact unlawful, the seized contraband could be subject to exclusion as the fruit thereof. Cf. Alderman v. United States, 394 U.S. 165, 176-177, 89 S.Ct. 961, 968-969 (1969)("[i]f police make an unwarranted search of a house and seize tangible property belonging to third parties . . . the homeowner may object to its use against him

[regardless of ] any interest in the seized items . . . because they were the fruits of an unauthorized search of his house"). Cf. also State v. Webb, 790 P.2d 65, 80-81 (Utah 1990)("[a] defendant who establishes a privacy interest in the place searched sufficient to contest the legality of that search, in order to suppress evidence seized as a product of it, is not deprived of fourth amendment standing to assert that claim merely because another person actually owns the evidentiary items actually seized or the personal effect in which the seized items were found").

The reliance by the trial court and the State upon Roberge, 642 S.W.2d at 716, to reach a contrary conclusion is misplaced. In Roberge, a trooper with the Tennessee Highway Patrol stopped a car in which the defendant was riding when the trooper observed the car weaving across several lanes. Id. at 717, 719. The trooper discovered that both the driver of the car and the defendant were intoxicated. Id. at 719. Accordingly, he called for assistance and additionally arranged for a "local wrecker company" to tow the car off the interstate highway. Id. Before allowing the towing company to move the car, the trooper conducted a search of the car and discovered a duffel bag in the trunk. Id. at 719-720. A search of the duffel bag revealed, in turn, seventy-four pounds of peyote cactus buttons containing mescaline. Id. at 717.

In affirming the trial court's denial of the defendant's motion to suppress the peyote cactus buttons, the supreme court held that the appellant did not have standing to challenge the search of the duffel bag, because he never claimed "any right, title or interest in or to the duffel bag or its contents." Id. at 719-720. However, unlike the appellant in the instant case, the defendant in Roberge did not allege that he had been unlawfully seized. Rather, at trial and on appeal, the defendant only challenged the search of the trunk of the car and the search of the duffel bag. Id. at 717-718. Moreover, in affirming the trial court's ruling in Roberge, the supreme court did not rely solely upon the defendant's lack of standing to challenge the search of the duffel bag but carefully noted that the search of the trunk of the car, as to which the defendant *did* possess standing, was a valid inventory search. Id. at 717-718, 719-720. In short, the defendant's lack of standing to challenge the search of the duffel bag was only dispositive in the context of a valid inventory search of the trunk of the defendant's car. Similarly, in this case, the appellant's lack of standing to challenge the search of Ms. Howard's suitcase[5] is only dispositive if the search itself and the discovery of the drugs and electronic scales are not the fruit of a preceding violation of the Fourth Amendment rights of the appellant.

Thus, we address the appellant's standing to challenge his alleged detention after the purpose of the traffic stop had been fulfilled and the appellant's standing to challenge the search of the Suburban. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures , shall not be violated . . . ." Article I, Section 7 of the Tennessee Constitution similarly provides "[t]hat the people shall be secure . . . from unreasonable searches and seizures . . . ." In the context of these particular

---

[5]We note that, while the appellant contests the trial court's denial of his motion to suppress, the appellant does not contest the trial court's narrow conclusion that he lacked any legitimate expectation of privacy in Ms. Howard's suitcase.

constitutional provisions,[6] the so-called "standing" requirement is simply the "rigorous application of the principle that the rights [thereby] secured are personal." Rakas v. Illinois, 439 U.S. 128, 139, 99 S.Ct. 421, 428 (1978).

> [T]he question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

Id. at 140, 429. In other words, in challenging the lawfulness of a search or seizure under either the United States or Tennessee Constitution, a defendant must preliminarily establish that the disputed search or seizure intruded upon his own privacy or personal security. State v. Daniel, No. E1997-00142-SC-R11CD, 2000 WL 100069, at *2 (Tenn. at Knoxville, January 31, 2000). See also State v. White, 635 S.W.2d 396, 399 (Tenn. Crim. App. 1982).

With respect to the alleged seizure of the appellant by Trooper Sprawling after the purpose of the initial traffic stop had been fulfilled, it is beyond dispute that a criminal defendant may challenge his own seizure. Erwin, 875 F.2d at 270 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578 (1975)). Moreover, the trial court in this case suggested in reliance upon Morelock, 851 S.W.2d at 838, that Trooper Sprawling's questioning of the appellant following the issuance of the traffic citation and the return of the appellant's documents was inherently coercive and, in fact, constituted a seizure. However, the United States Supreme Court has observed that,

> not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16 (1968). Similarly, in Ashworth, 3 S.W.3d at 29 (quoting Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 216-217, 104 S.Ct. 1758, 1762-1763 (1984)), this court recently noted that

> "police questioning, by itself, is unlikely to result in a Fourth Amendment violation. . . . Unless the circumstances of [an] encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment."

We therefore concluded in Ashworth that, unless a driver has objectively reasonable cause to believe that he is not free to leave, a traffic stop ceases to be a detention and becomes a consensual encounter

---

[6]The Tennessee Supreme Court has noted that generally "'article I, section 7 is identical in intent and purpose with the Fourth Amendment.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997)(citation omitted). We consider the protections of these constitutional provisions to be coextensive for purposes of this opinion.

when the police officer issues a citation or warning and returns a driver's license and registration, notwithstanding any additional questions posed by the officer. Id. at 30 (citing United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998), and United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997)). See also, e.g., United States v. White, 81 F.3d 775, 778-779 (8th Cir. 1996); United States v. Werking, 915 F.2d 1404, 1408-1409 (10th Cir. 1990); United States v. Poulack, 82 F. Supp. 2d 1024, 1030 (D. Neb. 1999); United States v. D'Armond, 80 F. Supp. 2d 1157, 1164 (D. Kan. 1999); Ferris v. State, 735 A.2d 491, 499-506 (Md. 1999); Commonwealth v. Hoak, 700 A.2d 1263, 1267 (Pa. Super. Ct. 1996).

According to this analysis and the undisputed facts contained in the record, the appellant was not the subject of a seizure when Trooper Sprawling inquired concerning the presence of contraband in the car. Moreover, if one accredits Trooper Sprawling's testimony, the appellant was not the subject of a seizure at the time Trooper Sprawling requested and received the appellant's consent to search the Suburban. In this regard, the appellant's citation to Morelock, 851 S.W.2d at 838, and the trial court's reliance thereupon, is unavailing. It was undisputed in Morelock that, at all times during the encounter between the officer and the defendant, the defendant *was* the subject of a seizure. On the other hand, if one accredits the appellant's testimony that he never consented to the search of the Suburban, the State effectively concedes (by the lack of any argument to the contrary) that the search was unlawful. Because the trial court disposed of the appellant's motion to suppress on the basis of his lack of standing to challenge the search of Ms. Howard's suitcase, the court failed to make the necessary credibility determinations.

With respect to the search of the Suburban, an individual who uses an automobile with the permission of the owner normally does have standing to object to a search of the automobile. See, e.g., United States v. Garcia, 897 F.2d 1413, 1417-1418 (7th Cir. 1990); United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990); Blanco, 844 F.2d at 349; United States v. Miller, 821 F.2d 546, 548-549 (11th Cir. 1987); United States v. Portillo, 633 F.2d 1313, 1317 (9th Cir. 1980). In this case, the record reflects that the Suburban belonged to the appellant's father, and, at the time of the traffic stop, the appellant was driving to Alabama in accordance with his mother's instructions to deliver money to her parents. The record is devoid of testimony concerning whether the appellant's father granted him permission to use the car. Moreover, the trial court failed to make any findings of fact concerning the appellant's privacy interest in the Suburban as opposed to Ms. Howard's suitcase. In any event, the record is probably sufficient to establish the appellant's standing to challenge the search of the Suburban. United States v. Doe, 801 F. Supp. 1562, 1573 (E. D. Texas 1992)("[w]hile the burden is on the defendant to show his possession was lawful, the evidentiary demonstration required to discharge this burden will be less when there is no evidence showing unlawful possession").

In sum, the absence of any factual findings by the trial court would normally require a remand of this case to the trial court. However, we reverse the appellant's judgments of conviction and dismiss this case upon another ground.

**B.** **Did the Trial Court Err in Denying the Appellant's Motion for a Judgment of Acquittal**

-10-

**at the Close of the State's Case and, Again, at the Conclusion of the Trial?**

The appellant next asserts that the State failed to satisfy its burden of proof at the appellant's trial, warranting the grant of the appellant's motion for a judgment of acquittal either at the close of the State's case or at the conclusion of the trial. Principles of due process protect an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In the Matter of Samuel Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970). The reasonable-doubt standard "provides concrete substance for the presumption of innocence - - that "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" Id. at 363, 1072. Consistent with this principle, the State may prove a criminal offense by the use of circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn.1987); Marable v. State, 313 S.W.2d 451, 456-457 (1958); State v. Knight, 969 S.W.2d 939, 941 (Tenn. Crim. App. 1997). However, before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). See also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). "In summary, a conviction for a criminal offense cannot be predicated solely upon conjecture, guess, speculation, or a mere possibility that [the accused] may be guilty." State v. Transou, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996).

A motion for a judgment of acquittal is a challenge to the sufficiency of the State's evidence of a defendant's guilt. Tenn. R. Crim. P. 29(a). In ruling upon a motion for judgment of acquittal, the trial court may not address the weight of the evidence, but must afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence. State v. Blanton, 926 S.W.2d 953, 957-958 (Tenn. Crim. App. 1996). An appellate court applies the same standard as the trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). See also State v. Smith, No. 02C01-9506-CR-00157, 1999 WL 162958, at *2 (Tenn. Crim. App. at Jackson, March 25, 1999). This standard "is analogous to the standard employed in reviewing the sufficiency of the convicting evidence after a conviction has been imposed." State v. Lindsay, No. 02C01-9804-CR-00110, 1999 WL 1095679, at *6 (Tenn. Crim. App. at Jackson, October 28, 1999).

The State in this case was required to prove beyond a reasonable doubt the appellant's knowing possession of three hundred (300) grams or more of cocaine with the intent to sell or deliver the drugs, Tenn. Code Ann. § 39-17-417(a)(4) and (j)(5)(1997), his knowing possession of one-half (½) ounce or more of marijuana with the intent to sell or deliver the drugs, Tenn. Code Ann. § 39-17-417(a)(4) and (g)(1), and his possession of drug paraphernalia with the intent to use the paraphernalia. Tenn. Code Ann. § 39-17-425 (a)(1)(1997). We conclude that the State failed to prove beyond a reasonable doubt the appellant's possession of the drugs and electronic scales and, accordingly, reverse the appellant's convictions.

In Transou, 928 S.W.2d at 955-956 (citations omitted), this court addressed the

-11-

meaning of the term "possession" in the context of both Tenn. Code Ann. § 39-17-417 and Tenn. Code Ann. § 39-17-425:

> "The term possession . . . embraces both actual and constructive possession. . . . Before a person can be found to constructively possess a drug, it must appear that the person has 'the power and the intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.' . . . In other words, 'constructive possession is the ability to reduce an object to actual possession.' . . . The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. . . . Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs."

We have held, however, that a defendant's possession of contraband may be inferred from a defendant's ownership or control over a vehicle in which the contraband is secreted. State v. Brown, 915 S.W.2d 3, 7-8 (Tenn. Crim. App. 1995); State v. Shaw, No. 02C01-9811-CC-00363, 1999 WL 1095630, at *4 (Tenn. Crim. App. at Jackson, October 21, 1999); State v. Sullivan, No. 02C01-9803-CC-00071, 1999 WL 134981, at *3 (Tenn. Crim. App. at Jackson, March 15, 1999); State v. Sanders, No. 1, 1990 WL 11637, at *2 (Tenn. Crim. App. at Jackson, February 14, 1990).

In the instant case, the appellant did, in fact, have control of the vehicle in which police found the drugs and electronic scales which are the subject of the appellant's convictions. However, the drugs and electronic scales were inside a closed suitcase belonging to Christina Howard. The suitcase did not contain any items belonging to the appellant, nor did the State adduce any evidence at trial that the appellant had access to the contents of Ms. Howard's suitcase. The appellant's undisputed testimony at trial established that, at the time of the traffic stop, he was not living with Ms. Howard nor was he engaged in an intimate relationship with her. Rather, the appellant testified that he was simply giving Ms. Howard a ride to her mother's home in St. Louis, Missouri. Other than the contraband found in Ms. Howard's suitcase and on her person, the police did not discover any other drugs or paraphernalia in the appellant's suitcase, in his cousin's suitcase, or in the Suburban itself. Trooper Sprawling and Officer Kirby both testified that, in searching the Suburban, they could not detect any odor indicative of drug *use*. Finally, the appellant testified and it was undisputed that he had no prior criminal history.

The State nevertheless argues that the appellant's possession of a gun, an extra ammunition clip, a box of ammunition, and one thousand, six hundred, and forty-five dollars ($1,645.00), the manner in which the money was separated and folded, and the appellant's use of a "slang term which the jury was informed was common in the drug community" sufficed to establish the appellant's constructive possession of the drugs and paraphernalia. However, as to the cash, the appellant and his mother testified at trial and it was undisputed that Ms. Jackson had given the money to her son for the purpose of assisting her father in paying various bills and it was undisputed that Ms. Jackson customarily folds her money. As to the gun, the appellant did possess a valid

Indiana gun permit. Moreover, the appellant's possession of ammunition for the gun is hardly unusual, and he testified that the extra clip simply came with the gun when he purchased it. Finally, we acknowledge that the appellant's use of the term "fold" in referring to the bundle of money containing one thousand dollars ($1,000) in combination with the above evidence could raise the possibility that the appellant was aware of the drugs and paraphernalia inside Ms. Howard's suitcase and had the power and intention to exercise dominion and control over the contraband. However, we have already noted that a conviction for a criminal offense cannot be predicated upon the mere possibility that the accused may be guilty.

In conclusion, we wish to emphasize that we do not reverse the appellant's convictions lightly. The amount of drugs discovered by police in this case was significant, and this court is well aware of the damage inflicted upon our society by the illicit traffic in drugs. However, as the United States Supreme Court has observed,

> [t]he accused during a criminal prosecution [also] has at stake [an] interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

In the Matter of Samuel Winship, 397 U.S. at 363-364, 90 S.Ct. at 1072.

### III.  Conclusion

For the foregoing reasons, we reverse the trial court's judgments of conviction and dismiss this case.

-13-